1  Brett G. Evans (Bar No. 244213)
   brett@eklawpc.com
2  Evans & Kob, PC
   155 N. Riverview St., Suite 304
3  Anaheim, California 92808
   Telephone:  (657) 210-2114
4  Facsimile:   (888) 956-7890

5  Wesley Felix (*Pro Hac Vice Pending*)
   wfelix@deisslaw.com
6  DEISS LAW, P.C.
   10 West 100 South, Suite 425
7  Salt Lake City, Utah  84101
   Telephone:  (801) 433-0226
8  Facsimile:   (801) 386-9894

9  Attorneys for Plaintiff S&S Worldwide, Inc.

**NO SUMMONS ISSUED**

**FILED**

San Francisco County Superior Court

OCT 29 2019

CLERK OF THE COURT
BY: _____
Deputy Clerk

10          SUPERIOR COURT OF THE STATE OF CALIFORNIA

11                  COUNTY OF SAN FRANCISCO

12  S & S WORLDWIDE, INC., a Utah        Case No. __CGC-19-580355__
    corporation,
13                                        **COMPLAINT FOR:**
                   Plaintiff,
14                                        **(1) NEGLIGENCE**
          vs.                             **(2) BREACH OF CONTRACT**
15                                        **(3) AIDING AND ABETTING**
                                              **CONVERSION**
16  WELLS FARGO BANK, National            **(4) AIDING AND ABETTING FRAUD**
    Association, WELLS FARGO & COMPANY,   **(5) UNJUST ENRICHMENT/**
17  a Delaware corporation, and DOES 1-100,    **CONSTRUCTIVE TRUST**
    inclusive.                            **(6) VIOLATION OF CALIFORNIA**
18                                            **UNFAIR COMPETITION ACT**
                   Defendants.
19                                        **JURY TRIAL DEMANDED**

20                                        (Unlimited Civil Case)

21

22

23                                        E LEGAL

24

25

26

27

28

1    Plaintiff, S & S Worldwide, Inc. ("S&S"), alleges on information and belief, as follows:

2    **I.    INTRODUCTION**

3    1.   Plaintiff S & S Worldwide, Inc. ("S&S") is the victim of fraudulent scheme knowingly

4    assisted by Defendants Wells Fargo & Company ("WBC") and its wholly-owned subsidiary Wells

5    Fargo Bank, N.A. ("WFB," and collectively with WBC, the "Bank"). By its substantial assistance,

6    including both the actions of the Bank and its employees in furtherance of and to facilitate the

7    scheme, and through its knowledge that funds it held were being diverted to fraudsters, the Bank

8    aided and abetted the scheme. Moreover, the Bank was negligent in failing to act, as it was required

9    to do, once it became aware that the funds were being diverted.

10   2.   The Bank negligently failed to perform its duty to its customer, plaintiff S&S, when it

11   allowed a fraudster, Ronald L. Kuntz ("Kuntz"), to liquidate his account through six fraudulent wires

12   totaling approximately $1.3 million within a matter of days without following federal regulations or

13   industry standards and willfully ignoring the suspicious circumstances in which the wire transfers

14   were initiated. Kuntz and the hackers did not perpetrate the fraudulent scheme alone. Instead, the

15   scheme depended on the knowing participation of the Bank, the bank through which funds were

16   wired, transferred, and disbursed.

17   3.   The Bank further breached its duty to S&S when, upon learning of the fraud, it refused to

18   take any steps to recall the fraudulent wire transfers **until and unless S&S agreed to release WFB**

19   **and WBC from liability for its negligent conduct**. This and other conduct delayed the discovery

20   and, thus, prevented the recovery of the funds.

21   **II.   BACKGROUND FACTS**

22   **A. JURISDICTION AND VENUE**

23   4.   This Court has jurisdiction of this case under Article VI, section 10 of the California

24   Constitution and pursuant to Code of Civil Procedure section 410.10

25   5.   Venue in this County is proper in accordance with Code of Civil Procedure sections 395.2,

26   395(a) and 395.5 because: (i) Defendant WFB is, and at all times mentioned in this complaint has

27   been, is a national banking association chartered under the laws of the United States, and authorized

28   to do business in California, with its principal place of business in the State of California in the City

1  of San Francisco, the County of San Francisco, in the State of California; and (ii) Defendant WBC

2  is, and at all times mentioned in this complaint has been, a Delaware corporation and authorized to

3  do business in California with its principal place of business in the City of San Francisco, the County

4  of San Francisco, in the State of California.

5      6. The Court has personal jurisdiction over the Defendants because they are residents of and/or

6  doing business in the State of California; because a substantial portion of the wrongdoing alleged

7  herein took place in California; because Defendants reside or resided in California or purposely

8  participated in acts occurring in California at relevant times, are or were authorized to conduct

9  business in California, do or did conduct business in California, have intentionally availed

10  themselves of California economic opportunities and California law; and/or otherwise possess

11  sufficient minimum contacts with California so as to render the exercise of jurisdiction by California

12  courts permissible under traditional notions of fair play and substantial justice.

13      **B. PARTIES**

14      7. Plaintiff S&S is a corporation organized and existing under the laws of the State of Utah.

15      8. Defendant Wells Fargo & Company ("WBC") is, and at all times herein, was a Delaware

16  corporation and doing business in the State of California with its principal place of business in the

17  City of San Francisco, the County of San Francisco, in the State of California.

18      9. Defendant Wells Fargo, N.A. ("WFB") is, and at all times herein, was a national banking

19  association chartered under the laws of the United States, doing business in the State of California,

20  with its principal California place of business in the City of San Francisco, the County of San

21  Francisco, in the State of California. WFB provides WFC's personal and commercial banking

22  services, and is WFC's principal subsidiary. Up until approximately September 8, 2016, WFB held

23  itself out as the nation's largest bank by market capitalization. It is an entity registered with the

24  Secretary of State of California as a National Association doing business in the State of California.

25      10. Plaintiff is unaware of the true names and capacities of the Defendants sued herein as Does 1

26  through 100, and therefore sues said Defendants by such fictitious names. Plaintiff will amend this

27  complaint to allege the true names and capacities of the fictitiously named Defendants when their

28  names and identities have been ascertained. Plaintiff is informed and believes and based thereon

1   alleges that the Doe Defendants are legally responsible for the acts complained of herein. References

2   to, and allegations concerning, the named Defendants shall be deemed to include like references to,

3   and allegations concerning, the Doe Defendants. (WFB, WFC and DOES 1-200, inclusive, and each

4   of them are hereinafter collectively referred to herein as "Defendants").

5       11. Plaintiff is informed and believes and based thereon alleges at all times herein mentioned,

6   Defendants, and each of them, acted as the agents, servants and employees of the other named

7   Defendants and in doing the acts complained of herein, acted in the course and scope of said agency

8   and employment.

9       12. On information and belief, it further is alleged that the Defendants WFC and WFB were at all

10   times relevant hereto, the alter egos of each other such that to affirm the legal separateness of the

11   Defendants for purposes of the claims presented in this action would lead to an injustice and/or

12   inequitable result. There is a unity of interest and ownership between the corporate Defendants and

13   its equitable owners(s) that the separate personalities of the company and its shareholders do not in

14   reality exist. Defendants exhibit an interrelation of operations, commingling of funds, lack of

15   observation of corporate formalities, undercapitalization, centralized control, common management,

16   and common financial control such that they are an integrated enterprise and/or are alter egos. The

17   company is a mere shell, instrumentality, and conduit through which the individual defendant(s)

18   carried on their business, exercising complete control and dominance of such business to the extent

19   that any individuality or separateness of the Defendants does not and did not exist. Based on the

20   facts alleged herein, adherence to the legal fiction of the existence of all Defendants separate and

21   apart from each other would sanction their wrongful conduct and promote injustice.

22   **III.    GENERAL ALLEGATIONS AND BACKGROUND**

23       **A. FRAUDSTER OPENS AND MAINTAINS FRAUDULENT ACCOUNT WITH BANK FOR**

24           **APPROXIMATELY ONE YEAR WITH MINIMAL ACTIVITY**

25       13. On October 17, 2016, Ronald L. Kuntz ("Kuntz") opened a Business Account with WFB (the

26   "Fraudulent Account"), which according to the application, was for a **construction company with**

27   **annual gross sales of only $100,000** and no international transactions information listed in the

28   appropriate documentation area on the Fraudulent Account application.

1    14. During the approximately one year that Kuntz "seasoned" the account with WFB, the

2  Fraudulent Account maintained an **average monthly balance of approximately $908.84**.

3    15. Other than one check that immediately bounced (deposited of $37,293.62 on October 25,

4  2016 that was returned as unpaid on October 27, 2016), the following is the entirety of the

5  Fraudulent Account's activity, which all deposits and withdrawals were made by Kuntz in a branch,

6  never by wire or other form of electronic transfer:

7        a.  On October 17, 2016, Kuntz opened the Fraudulent Account with a deposit of

8            $500.00.

9        b.  On November 7, 2016, Kuntz made a deposit of $50.00.

10       c.  On February 21, 2017, Kuntz made a deposit of $40.03.

11       d.  On February 27, 2017, Kuntz made a deposit of $216.38.

12       e.  On May 17, 2017, Kuntz made a deposit of $680.00.

13       f.  On May 18, 2017, one day after making one of his largest deposits, Kuntz withdrew

14           $1,274.54.

15       g.  On May 23, 2017, Kuntz made a deposit of $250.00.

16       h.  On May 23, 2017, Kuntz made a deposit of $75.00.

17       i.  On June 16, 2017, Kuntz made a deposit of $110.00.

18       j.  On June 26, 2017, Kuntz made a deposit of $60.00.

19       k.  On June 30, 2017, Kuntz made a deposit of $60.00.

20       l.  On July 6, 2017, Kuntz made a deposit of $300.00.

21       m.  On July 18, 2017, Kuntz made a deposit of $20.00.

22       n.  On July 27, 2017, Kuntz made a deposit of $60.00.

23       o.  On August 4, 2017, Kuntz made a deposit of $750.00.

24       p.  On August 7, 2017, Kuntz made a deposit of $25.00.

25       q.  On August 17, 2017, Kuntz made a deposit of $2,120.

26       r.  On August 17, 2017, the same days as Kuntz's largest deposits, he immediately

27           withdrew $2,000.

28       s.  On August 23, 2017, Kuntz made a deposit of $300.00.

1          t.   On August 25, 2017, Kuntz withdrew $700.00.

2          u.   On September 2, 2017, Kuntz made a deposit of $365.

3          v.   On September 11, 2017, Kuntz made a deposit of $250.

4          w.   On September 19, 2017, Kuntz made a deposit of $695.

5          x.   On September 26, 2017, Kuntz withdrew $700.

6          y.   On September 29, 2017, Kuntz made a deposit of $135.

7          z.   On October 3, 2017, Kuntz made a deposit of $25.

8          aa.  On October 11, 2017, Kuntz made a deposit of $305.

9          bb. On October 18, 2017, Kuntz made a deposit of $125.

10     16. S&S is informed and believes that WFC and on such information and belief allege that WFB

11 monitored the Fraudulent Account, pursuant to relevant banking regulations, and would have been

12 aware that prior to a $1.3 million incoming wire transfer, that the Fraudulent Account maintained an

13 average monthly balance of approximately $908.84, only had deposits within the branch that

14 averaged $313.18 and average withdrawals of $1,168.64. Based on such monitoring and activity, a

15 $1.3 million wire transfer followed by rapid outgoing wire transfers, nationally and internationally,

16 did or should have set off an investigation and alarm bells requiring WFB to take immediate action,

17 such as to freeze the Fraudulent Account and cease doing business with Kuntz and the Fraudulent

18 Account.

19     17. S&S is informed and believes that WFC and on such information and belief allege that WFB

20 did determine, did know or should have known, based on such monitoring and clearly out of the

21 ordinary transaction, that the Fraudulent Account and Kuntz were a high rick potential customer,

22 which would be subject to enhanced due diligence pursuant to its Anti-Money Laundering and Know

23 Your Customer policies, but also that they were part of a fraudulent scheme, but did not cease doing

24 business with Kuntz or the Fraudulent Account.

25     18. S&S is informed and believes that WFC and on such information and belief allege that WFB,

26 as a result of its enhanced due diligence procedures, had concerns about the legitimacy of the

27 Fraudulent Account, Kuntz and his construction company, had no discernible prior business history,

28 was incorporated out of state and maintained no separate verifiable physical business address other

1    than Kuntz's own personal residence.

2        19. S&S is informed and believes that WFC and on such information and belief allege that WFB

3    determined to open and maintain the Fraudulent Account on the basis of its systematic sales

4    misconduct and lack of oversight, as discussed herein.

5        **B.  BANK PROCESSES FRAUDULENT WIRES DESPITE SUSPICIOUS CIRCUMSTANCES**

6        20. In the fall of 2017, an email chain between S&S and one of its vendors about a payment for

7    goods was intercepted by unknown hacker(s) ("Hacker"), who by posing as the vendor and changing

8    one letter in the email address, directed S&S to make the payment to an account that turned out not

9    to be associated with the vendor, but the Fraudulent Account maintained by Kuntz and his alleged

10   business.

11       21. Based on that email, S&S wired approximately $1.3 million to the Fraudulent Account on

12   October 20, 2017 (the "Initial Wire").

13       22. The Fraudulent Account owned by Kuntz never had a wire transfer, electronic transfer or any

14   deposit larger than $2,120, was supposedly a construction company account that had annual sales of

15   $100,000, and had previously an average monthly balance of approximately $908.84 since opening

16   approximately one year suddenly and miraculously had a balance of $1,290,610.15, which on

17   information and belief, did or should have set alarm bells off at WFB.

18       23. In conspiracy with the hackers, Kuntz opened up the Fraudulent Account at WFB almost

19   exactly one year before the Initial Wire in the same state as the vendor where payment was supposed

20   to be made.

21       24. Kuntz could not have perpetrated the fraud on his own.  Instead, he crucially depended on the

22   participation of WFB through which Kuntz committed his fraud.

23       25. Upon information and belief, WFB did not comply with industry standards and/or regulations

24   intended to prevent persons from opening accounts for fraudulent purposes when it allowed Kuntz to

25   open the Fraudulent Account.

26       26. WFB knew or should have known the nature of Kuntz's business through the performance of

27   its due diligence when Kuntz opened the account.

28       27. At the time of the Initial Wire, the Fraudulent Account contained less than $2,900

1 ("Historical Prior Balance").

2     28. Within days of the Initial Wire and over the course of two weeks, Kuntz went to three

3 different Wells Fargo branches and initiated six wire transfers for hundreds of thousands of dollars

4 each, entirely liquidating the funds transferred in the Initial Wire. Thus, in less than three weeks

5 from the Initial Wire, **WFB turned a blind eye to multiple suspicious transfers that resulted in**

6 **depleting a prior nominal account of $1.3 million**.

7     29. The Funds transfer and Transmittal of Funds Recordkeeping Rules of the Bank Secrecy Act

8 (the "BSA") require beneficiary banks to review, collect and retain all incoming wire transfer

9 payment order information for transfers in excess of $3,000. S&S is informed and believe and on

10 such information and belief allege that WFB did review, collect and retain the incoming wire

11 transfer payment order information for the wire transfer to the Fraudulent Account.

12     30. WFB willfully ignored the suspicious circumstances, refusing to make a reasonable inquiry,

13 and allowed the funds to be dissipated.

14     31. Kuntz's receipt of unprecedented sums of money followed by his immediate liquidation of

15 those funds suggest the very criminal activity that the enhanced customer due diligence regulations

16 and reporting requirements were intended to prevent.

17     32. WFB, however, ignored its obligations, allowing the wire transfers to be processed in the

18 face of dubious circumstances and without taking even minimal steps to verify the propriety of the

19 wire transfers.

20     33. In other words, Kuntz's account went from approximately $2,900.00 to $1.3 million in a day,

21 **a 44,928% increase from the Historical Prior Balance**, and he immediately began liquidating the

22 account through a series of six-figure and multi-national wire transfers processed by WFB that

23 resulted in depleting a prior nominal account of $1.3 million.

24     34. On October 23, 2017, despite that the Fraudulent Account never previously sent or received a

25 wire or was noted by WFB to participate in international transactions and maintained only a nominal

26 balance with minimal transactions, with the assistance of a banker named Kristin Siri at WFB branch

27 no. 03385, Kuntz sent a wire in the amount of $357,000 from the Fraudulent Account, **a transfer**

28 **amount equivalent to 39,281% of the average monthly balance therein,** to another intermediary

EK EVANS & KOB, PC

1  company account of Brogsek Logistics in Houston, Texas at ZB NA DBA Amegy Bank. Neither

2  Kuntz nor the banker provided any phone number for the recipient, instructions or purpose for the

3  wire, according to the wire instruction information.

4      35. On October 25, 2017, despite that the Fraudulent Account never previously sent or received a

5  wire or was noted by WFB to participate in international transactions and maintained only a nominal

6  balance with minimal transactions, with the assistance of a banker named Tiffany Lynn Talley at

7  WFB branch no. 03367, Kuntz sent a wire in the amount of $395,700 from the Fraudulent Account,

8  **a transfer amount equivalent to 43,539% of the average monthly balance therein,** to another

9  intermediary company account of Siriya Logistics in Houston, Texas through Bank of America,

10  N.A. located in New York, NY. Neither Kuntz nor the banker provided any phone number for the

11  recipient, instructions or purpose for the wire, according to the wire instruction information.

12      36. On October 30, 2017, despite that the Fraudulent Account never previously sent or received a

13  wire or was noted by WFB to participate in international transactions and maintained only a nominal

14  balance with minimal transactions, with the assistance of a banker named Duster Butler at WFB

15  branch no. 03364, Kuntz sent a wire in the amount of $200,000 from the Fraudulent Account, **a**

16  **transfer amount equivalent to 22,006% of the average monthly balance therein,** to an account

17  of Kong Kimseng in Phnom Penh, Cambodia through Maybank (Cambodia) PLC in Phnom Penh

18  City, Cambodia. Neither Kuntz nor the banker provided any phone number for the recipient,

19  instructions or purpose for the wire, according to the wire instruction information.

20      37. With WFB's assistance and approval of the wire transfer, Kuntz transferred $200,000 to

21  Cambodia, which is listed by the U.S. Department of State as a Jurisdiction of Primary Concern

22  among known money laundering countries.

23      38. On October 30, 2017, despite that the Fraudulent Account never previously sent or received a

24  wire or was noted by WFB to participate in international transactions and maintained only a nominal

25  balance with minimal transactions, with the assistance of a banker named Duster Butler at WFB

26  branch no. 03364, Kuntz sent a wire in the amount of $200,000 from the Fraudulent Account, **a**

27  **transfer amount equivalent to 22,006% of the average monthly balance therein,** to an account

28  of Kong Vechet in Phnom Penh City, Cambodia through ABA Bank in Phnom Penh, Cambodia.

1    Neither Kuntz nor the banker provided any phone number for the recipient, instructions or purpose

2    for the wire, according to the wire instruction information.

3        39. With WFB's assistance and approval of the wire transfer, Kuntz again transferred another

4    $200,000 to Cambodia, for a total of $400,000, which is listed by the U.S. Department of State as a

5    Jurisdiction of Primary Concern among known money laundering countries.

6        40. On November 1, 2017, despite that the Fraudulent Account never previously sent or received

7    a wire or was noted by WFB to participate in international transactions and maintained only a

8    nominal balance with minimal transactions, with the assistance of a banker named Kristin Siri at

9    WFB branch no. 03385, Kuntz sent a wire in the amount of $80,000 from the Fraudulent Account to

10   another intermediary company account of Ludenex Supplies with no location provided through

11   Capital One, N.A. in New York, NY. Neither Kuntz nor the banker provided any address or phone

12   number for the recipient, instructions or purpose for the wire, according to the wire instruction

13   information.

14       41. On November 3, 2017, despite that the Fraudulent Account never previously sent or received

15   a wire or was noted by WFB to participate in international transactions and maintained only a

16   nominal balance with minimal transactions, with the assistance of a banker named Samantha J. Jones

17   at WFB branch no. 03385, Kuntz sent a wire in the amount of $35,100 from the Fraudulent Account

18   to another intermediary company account of Ludenex Supplies with no location provided through

19   Capital One, N.A. in New Orleans, LA. Neither Kuntz nor the banker provided any address or phone

20   number for the recipient, instructions or purpose for the wire, according to the wire instruction

21   information.

22       **C. WFB Delays Discovery and Recovery of Fraudulent Wire Transfers**

23       42. Before Kuntz initiated the October 30, 2017 wire transfers to Cambodia, however, he was

24   detained and questioned by WFB due to the suspicious nature of his wire and account history.

25       43. S&S is informed and believe and on such information and belief allege that early on, while

26   over $1 million remained in the Fraudulent Account, or no later than before the wire transfer to

27   Cambodia, when over $500,000 remained in the account, at least the branch banker and manager of

28   the branch where Kuntz, with the assistance and approval thereof, determined that Fraudulent

1   Account and Kuntz were involved with and/or participating in an illegitimate and fraudulent scheme.

2   S&S is informed and believe and on such information and belief allege that WFB, through its banker

3   and branch manager, determined that the money in the Fraudulent Account was being transferred

4   from the Fraudulent Account to third party accounts in bank secrecy havens or otherwise to accounts

5   to immediately dissipate the funds. S&S is informed and believe and, on such information, and belief

6   allege that the local branch manager suggested freezing the Fraudulent Account or taking other

7   preventive measures, but WFB did not because of its widespread, systematic sales misconduct and

8   lack of oversight, as discussed herein.

9   44. S&S is informed and believe and on such information and belief allege that despite the bank

10   branch managers concerns related to Kuntz's illegitimate and fraudulent activity, WFB continued to

11   approve and place the wire transfers to banking safe havens and to other third-party accounts to

12   immediately dissipate the funds.

13   45. Upon information and belief, WFB, however, did not follow industry standards, federal

14   regulations, its internal practices or take reasonable measures to investigate the purpose and

15   legitimacy of the wire transfers or to report them to the appropriate authorities despite that the wire

16   transfers were to Cambodia which is listed by the U.S. Department of State as a Jurisdiction of

17   Primary Concern among known money laundering countries.

18   46. Despite the concern over the suspicious nature of Kuntz's wire and account history, WFB,

19   that same day, allowed Kuntz to initiate the wire transfers totaling $400,000 to Cambodia without

20   taking reasonable measures to ensure the legitimacy of the wire transfers.

21   47. WFB also allowed Kuntz to continue liquidating his account through suspicious wire

22   transfers, including two wires on November 3, 2017, one for $35,100.00 to a fictitious business

23   account at a bank in New Orleans in which the wire transfer instructions were incomplete and one

24   for $80,000 to a fictitious business entity at a bank in New York.

25   48. Based on the multiple sources of knowledge alleged herein, including WFB's interaction

26   with Kuntz and its due diligence procedures, WFB's employees in its branch offices had knowledge

27   of Kuntz's account, that he had no or minimal substantive operations, that the only money flowing

28   into the account was a very large single payment that was immediately dissipated in a highly

1   suspicious manner and, as such, knew or should have known the fraudulent nature of the transactions

2   WFB facilitated.

3      49. S&S did not discover, and did not know of facts that would have caused a reasonable person

4   to suspect, that it had suffered harm by Defendants wrongful conduct that harmed S&S until

5   November 6, 2017, at the earliest, when S&S was notified by the vendor that payment still had not

6   been received. S&S began an immediate internal investigation and immediately notified WFB.

7      50. S&S requested that WFB assist it in freezing Kuntz's account and seeking to recall the wire

8   transfers.

9      51. WFB, however, refused to help S&S until S&S agreed to release WFB from liability for its

10   conduct.

11      52. S&S refused to acquiesce to the unconscionable demand that S&S release WFB from

12   liability for WFB's wrongful conduct before WFB would help S&S.

13      53. As a result of WFB's refusal to assist S&S, S&S was unable to recover most of the wires that

14   Kuntz had initiated through WFB.

15      54. S&S is informed and believe and on such information and belief allege WFB substantially

16   assisted Kuntz and the Hacker perpetrate the illegitimate and fraudulent activity by approving and

17   conducting numerous wire transfers from the Fraudulent Account at WFB to bank accounts either in

18   banking secrecy havens like Cambodia or third-party illegitimate business accounts throughout the

19   nation to further dissipate the funds.

20      **D. LONG-STANDING RELATIONSHIP BETWEEN WELLS FARGO AND S&S OBLIGATING**

21          **WFB TO SUSPICIOUS ACTIVITY IN FRAUDULENT ACCOUNT**

22      55. While the Initial Wire was not transmitted from S&S's customer account at WFB, S&S was

23   nonetheless a long-standing customer of WFC, WFB and various other affiliates and subsidiaries.

24      56. S&S had a substantial preexisting relationship with the Bank that would have given WFB

25   ample opportunity to learn of S&S's business and establish a connection with S&S's personnel and

26   financial practices.

27      57. From approximately 2011 to after the conduct in question (and after WFB demanded

28   indemnity to assist S&S), in approximately June 2018, S&S maintained business bank accounts with

1   WFB with significant historical transactions that Bank that would have given WFB ample

2   opportunity to learn of S&S's business and establish a connection with S&S's personnel or financial

3   practices.

4   58. Through January 2018, all of S&S's corporate credit cards were through and serviced by the

5   Bank, with historical monthly charges of $25-$90,000 with the last payment in April 2018,

6   substantially after the conduct in question, which would have given WFB ample opportunity to learn

7   of S&S's business and establish a connection with S&S's personnel or financial practices.

8   59. Beginning in 2016, WFC's subsidiary and WFB's affiliate, Wells Fargo Advisors, is the third

9   party administrator for S&S's corporate employee 401k plan with over $5 million in assets held at

10   Wells Fargo Advisors with active trading and management through one of the Bank's broker-dealer

11   and/or clearing firms.

12   60. Wells Fargo Advisors, by actively managing, overseeing and administering S&S's corporate

13   employee retirement accounts owes a fiduciary duty to S&S, and to the extent such entity is an alter

14   ego of the Bank, such duty may apply to the Bank.

15   61. S&S is informed and believe and thereon allege that WFB's internal policies and federally

16   mandated "Suspicious Activity Reports," WFB had already noted suspicious activities in Kuntz's

17   activity and the Fraudulent Account, by on or around the date of the Initial Wire,

18   62. S&S is informed and believes that WFB became aware of not only the sizeable amount of the

19   Initial Wire, but also the sizeable amount of outgoing wires from the Fraudulent Account, and

20   performed only a cursory investigation and filed a "Suspicious Activity Report."

21   63. WFB, however, failed to adequately investigate and/or stop the fraudulent activity and its

22   owner insider involvement in the scheme.

23   64. Despite being on notice and receiving interest and monetary benefit, WFB failed to

24   communicate the suspicious activities to S&S a duty which it assumed under the given facts, and a

25   duty that is not precluded by the Bank Secrecy Act, failed to conduct and adequate investigation,

26   failed to notify the appropriate law enforcement agency, failed to ascertain the extent of Kuntz, its

27   agents and others' involvement and assisted in the dissipation of S&S's funds from the Fraudulent

28   Account.

1       65. In total, the Bank had substantial understanding of S&S's business and personnel, would

2   have known that the Initial Wire to a construction company did not fit within S&S's business, and

3   through such relationship, had duties and obligations, beyond just typical banking practices, to

4   inquire into the banking activities of the wire and the Fraudulent Account, report any suspicious

5   activity to S&S and assist S&S, without unreasonable demands of indemnity, in recovering the funds

6   fraudulently transferred to the Fraudulent Account.

7       **E. THE BANK'S PERVASIVE CULTURE OF MISCONDUCT, AGGRESSIVE SALES PRACTICES**

8           **AND POLICIES AND LACK OF COMPLIANCE AND OVERSIGHT**

9       66. The foregoing dissipation would not have been possible in the absence of WFB's continuing

10  willful misconduct and aggressive practices and policies in relation to Plaintiff, Kuntz, and the

11  public at large in multiple respects.

12      67. Defendants have been subject to multiple actions that demonstrate a pattern and practice and

13  company culture of uniformly misrepresenting and/or repudiating their contractual and/or legal

14  obligations and remaining willfully ignorant of improper conduct in order to earn commissions.

15  Defendants have historically embarked upon a scheme to fraudulently open bank accounts on behalf

16  of existing or new customers in order to garner excess profits through a variety of fees charged to

17  and costs imposed on these accounts, including those that were opened and held by fictitious entities,

18  without reasonable care or due diligence, and skirting federal regulations and rules.

19      68. The Bank has instituted, and continues to maintain, highly-aggressive sales policies designed

20  to incentivize its employees and others directly or indirectly working with the Bank to engage in

21  improper conduct or ignore improper conduct related to the opening illegitimate accounts.

22      69. On or about **September 8, 2016**, the Consumer Financial Protection Bureau (hereafter

23  "CFPB") announced the assessment of a $185 million fine and a $5 million restitution fund against

24  WFB for engaging in ploys and incomplete, false, and/or misleading information to fraudulently

25  create unauthorized "fake" accounts. According to the CFPB, thousands of Respondent's employees

26  engaged in improper sales practices to satisfy sales goals and earn financial rewards under WFB's

27  incentive-compensation program, with WFB terminating roughly 5,300 employees for such practices

28  during the applicable period. According to WFB's own analysis, it concluded that its employees

1    opened **1,534,280 deposit accounts** that may not have been authorized and that may have been

2    funded through simulated funding, or transferring funds from consumers' existing accounts without

3    their knowledge or consent.

4       70. S&S is informed and believes and thereupon alleges that Defendant WFB utilized such

5    reprehensible tactics, as described herein, on a regular basis with members of the public, including

6    Kuntz and his business account, that foreseeably caused the losses alleged in this Complaint.

7       71. On **September 13, 2016**, while being interviewed on a CNBC cable television show, the

8    former CEO and Chairman of WBC publicly admitted liability for the failings of WFB and its

9    employees to adhere to its policies and requirements of conducting business in a legal way. The

10    interview is available at http://www.cnbc.com/2016/09/18/wells-fargo-ceo-john-stumpf-talks-with-

11    cnbcs-cramer-im-accountable.html. Therein, the former CEO and Chairman disclosed that a former

12    audit, from 2011 to 2015, identified approximately 2 million accounts that the auditors could not

13    determine whether the accounts were authorized or unauthorized.

14       72. In **September 2016**, WFB discloses that it fired approximately 5,300 employees over a few

15    years for opening phony accounts that earned WFB unwarranted fees and allowed its employees to

16    boost their sales figures and make more money. The foregoing behavior indicates a culture of willful

17    ignorance and disregard of applicable banking regulations in exchange for commissions.

18       73. On **September 29, 2016**, in testimony before the House Financial Services Committee, then-

19    CEO John Stumpf stated that he is "fully accountable for all unethical sales practices in our retail

20    banking business" and acknowledged his failure for "not doing more sooner to address the causes of

21    this unacceptable activity." While responsibility most surely does not lie with John Stumpf alone, he

22    rightfully acknowledged that he made significant mistakes and helped create the culture that resulted

23    in sales practice abuses.

24       74. On **November 18, 2016**, the Office of the Comptroller of the Currency ("OCC") revoked

25    provisions of certain consent orders that provided WFB relief from specific requirements and

26    limitations regarding rules, policies, and procedures for corporate activities, OCC approval of

27    changes in directors and senior executive officers, and golden parachute payments, whereby WFB is

28    required to provide prior written notice to the OCC of changes in directors and senior executive

1   officers.

2   75. On **December 13, 2016**, the Federal Reserve Board ("FRB") and Federal Deposit Insurance

3   Corporation ("FDIC") notified WFB that they had jointly determined that WFB's 2016 resolution

4   plan submission did not adequately remedy two of the three deficiencies previously identified by the

5   FRB and FDIC in its 2015 resolution plan. Rules adopted by the FRB and the FDIC under the Dodd-

6   Frank Act require large financial institutions, including WFB, to prepare and periodically revise

7   resolution plans, so-called "living-wills", that would facilitate their resolution in the event of

8   material distress or failure. As a result, the FRB and FDIC imposed restrictions on WFB's growth

9   and operations preventing it from establishing any foreign bank or foreign branch and from

10  acquiring any nonbank subsidiary until the deficiencies are remedied and WFB implemented actions

11  to limit the size of its nonbank and broker-dealer assets to levels in place as of September 30, 2016.

12  The deficiencies existed until the FRB and FDIC announced on December 19, 2017 that WFB's

13  resolution plan submission plan no longer contained deficiencies, but nonetheless, still contained a

14  certain specific shortcoming, which avoided the potential forced divestiture of certain assets or

15  operations.

16  76. In **March 2017**, the OCC downgraded WFB's Community Reinvestment Act (CRA) rating

17  to "needs to improve," from "outstanding" due to WFB's previously issued regulatory consent

18  orders, including those covering its discriminatory and illegal credit practices, including the fake

19  accounts scandal, which imposes regulatory restrictions and limitations on certain of its nonbank

20  activities and such rating is a consideration by regulators in reviewing applications to establish bank

21  branches and approving proposed bank mergers and acquisitions.

22  77. In **April 2017**, the Sales Practices Investigation Report (SPIR) issued by WFB reveals that

23  the bank's board of directors and bank executives knew of many of the issues underlying the fake

24  accounts scandal as far back as 2002 but did not take corrective action and did not fully disclose the

25  issues until September 2016. The report found that: (1) WFB's "sales culture and performance

26  management system, which, when combined with aggressive sales management, created pressure on

27  employees to sell unwanted or unneeded products to customers and, in some cases, to open

28  unauthorized accounts[;]" (2) "[c]orporate control functions were constrained by the decentralized

1   organizational structure and a culture of substantial deference to the business units[;]" (3) sales

2   practice risks were not timely disclosed to the Board and then "management reports did not

3   accurately convey the scope of the problem."

4       78. On **February 2, 2018**, pursuant to a consent order with the FRB, WFB's growth is restricted

5   until it improves the Board's governance oversight and WFB's compliance and operational risk

6   management. Further, the consent order requires third-party reviews related to the adoption and

7   implementation of such improvement plans. Until such third-party reviews are complete and the

8   plans are approved and implemented to the satisfaction of the FRB, WFB's total consolidated assets

9   will be limited to the level as of December 31, 2017. Further, once the asset limitation is removed, a

10  second third-party review must be conducted to assess the efficacy and sustainability of the

11  improvements.

12      79. On **April 20, 2018**, WFB entered into consent orders with the CFPB and the OCC regarding

13  compliance risk management program, automobile collateral protection insurance policies and

14  mortgage interest rate lock extensions, whereby WFC agreed to pay an aggregate $1 billion in civil

15  money penalties to resolve matters. WFC also submitted to the CFPB and OCC an enterprise-wide

16  compliance risk management plan and a plan to enhance the WFC's internal audit program.

17      80. Due to the systematic failures, the Bank has maintained large scale executive turnover and

18  had three different executive officers overseeing WFC over the last three years, yet on information

19  and belief, still has yet to substantially correct such systematic failures that assisted in the fraudulent

20  activity.

21                          **FIRST CAUSE OF ACTION**

22                              **(Negligence)**

23                             **(All Defendants)**

24      81. S&S incorporates and realleges the allegations set forth in paragraphs 1 through 80 of this

25  Complaint as though fully set forth herein.

26      82. WFB owed a duty of reasonable care in conducting all of its banking transactions.

27      83. WFB owed duties to S&S, its customer, to take reasonable steps to prevent it from suffering

28  foreseeable harm.

1   84. Banks such as WFB are required by federal law to know their customers and understand their

2   banking activities and conduct. They must supervise their customers' accounts and engage in due

3   diligence both at the outset of the relationship and continuously during the relationship with the

4   customer.

5       85. Pursuant to applicable banking regulations, a bank is required to collect and maintain

6   information concerning its customers. The bank must maintain procedures that allow it to "form a

7   reasonable belief that it knows the true identity of each customer." 31 CFR § 1020.220(a)(1).

8       86. To discharge its duties, the bank is required to collect information about the holder of each

9   account. 31 C.F.R. § 1020.220(a)(2). When a corporate entity rather than an individual opens an

10  account, the bank must obtain information about the individuals with authority or control over the

11  account. 31 CFR § 1020.220(a)(2)(ii)(C).

12      87. Pursuant to the applicable federal rules and regulations, the bank must develop, administer,

13  and maintain a program that ensures and monitors the bank's compliance with the Bank Secrecy Act

14  ("BSA"), 12 C.F.R. § 21.21, including regulations broadening its anti-money laundering provisions.

15  The BSA requires the Bank to develop, administer, and maintain a program to ensure compliance.

16  The program must be approved by the Bank's board of directors and noted in the board meeting

17  minutes. It must: (1) provide for a system of internal controls to ensure ongoing BSA compliance,

18  (2) provide for independent testing of the bank's compliance, (3) designate an individual for daily

19  coordination and monitoring for compliance, and (4) provide training for appropriate personnel.

20      88. Under the applicable rules and regulations, the Bank must also develop a customer due

21  diligence program that assists the bank in predicting the types of transactions, dollar volume, and

22  transaction volume each customer is likely to conduct, and which provides the bank with a way to

23  identify unusual or suspicious transactions for each customer. A bank's customer due diligence

24  program allows it to maintain an awareness of the unique financial activity of its customers and the

25  ability to predict the type and frequency of transactions in which its customers are likely to engage.

26      89. Customer due diligence programs should be tailored to the risk presented by individual

27  customers, such that the higher the risk presented, the more attention is paid. Where a customer is

28  determined to be high risk, banks should gather additional information about the customer and

1   accounts, including determining: (1) purpose of the account; (2) source of funds; (3) proximity of
2   customer's residence to the bank; and (4) explanations for changes in account activity.

3   90. The FDIC rules and regulations require banks to identify a BSA compliance officer who is a
4   senior bank official responsible for coordinating and monitoring compliance with the BSA.  FDIC
5   Rules & Regulations § 326.8.  The compliance officer must designate an individual at each office or
6   branch to monitor the bank's day-to-day compliance with the BSA.

7   91. The Federal Financial Institutions Examination Council ("FFIEC") was established by the
8   federal government in 1979 to prescribe uniform principles, standards, and report forms to promote
9   uniformity in the supervision of financial institutions.  The FFIEC's Bank Secrecy Act Anti-Money
10  Laundering Manual contains an overview of BSA and anti-money laundering compliance program
11  requirements, risks and risk management expectations, industry sound practices, and examination
12  procedures.  The FFIEC Manual is based on BSA laws and regulations and BSA and anti-money
13  laundering directives issued by federal banking agencies such as the Federal Reserve, Federal
14  Deposit Insurance Corporation (FDIC) and the office of the Comptroller of Currency.  *See* FFIEC
15  BSA/AML Examination Manual, p. 1 and Appendix A (2014), available at
16  https://www.ffiec.gov/bsa_aml_infobase/documents/bsa_ami_man_2014.pdf.

17  92. Customer due diligence polices, procedures, and processes are the "cornerstone of a strong
18  BSA/AML compliance program."  FFIEC BSA/AML Examinations Manual, p. 56.  The objective of
19  customer due diligence is to "enable the bank to predict with relative certainty the types of
20  transactions in which a customer is likely to engage."  *Id.*  An adequate customer due diligence
21  program should "assist the bank in determining which transactions are potentially suspicious."  *Id.*

22  93. A bank's customer due diligence ("CDD") processes, "should include . . . ongoing due
23  diligence of the customer base," id., and "ongoing process[es] . . . to ensure account profiles are
24  current . . . .," *id.* at p. 58.

25  94. Banks must also ensure that their employees follow BSA guidelines. Banks make compliance
26  a condition of employment and incorporate compliance with the BSA and its implementing
27  regulations into job descriptions and performance evaluations. Banks are therefore required to train
28  all personnel whose duties may require knowledge of the BSA on that statute's requirements.

1    95. Banks and their personnel must be able to identify and take appropriate action once put on

2    notice of any of a series of money laundering "red flags" set forth in the FFIEC BSA/AML

3    Examination Manual. These red flags include: (1) repetitive or unusual fund transfer activity; (2)

4    fund transfers sent or received from the same person to or from different accounts; (3) transactions

5    inconsistent with the account holder's business; (4) transfers of funds among related accounts; (5)

6    depositing of funds into several accounts that are later consolidated into a single master account; (6)

7    large fund transfers sent in round dollar amounts; (7) multiple accounts established in various

8    corporate names that lack sufficient business purpose to justify the account complexities; (8)

9    multiple high-value payments or transfers between shell companies without a legitimate business

10   purpose; (9) payments unconnected to legitimate contracts or revenue sources; (10) fund transfers

11   containing limited content or related party information; (11) transacting businesses sharing the same

12   address; and (12) an unusually large number of persons or entities receiving fund transfers from one

13   company.

14   96. Once WFB became aware of the suspicious circumstances surrounding Kuntz's account and

15   the subsequent transfers, WFB owed to S&S a duty of reasonable inquiry to investigate the transfers

16   and take reasonable measures to prevent them.

17   97. WFB owed S&S a duty to report the suspicious activity.

18   98. Once WFB began to investigate the suspicious activities surrounding the wire transfers, it

19   had a duty to reasonably and diligently conduct the investigation.

20   99. WFB owed a duty not to process wire transfers that were incomplete or otherwise deficient.

21   100.     Upon notice of the fraud, WFB had a duty of care to take reasonable measures to

22   assist S&S and not to intentionally drag its feet and attempt to extort a release of liability from S&S.

23   101.     WFB breached each of the foregoing duties.

24   102.     S&S suffered damages as a direct and foreseeable result of WFB's breach of its duties

25   to S&S.

26   103.     S&S is entitled to damages as a result of this harm in an amount to be proven at trial

27   which shall be no less than $1,000,000.

28

EVANS & KOB, PC

1          **SECOND CAUSE OF ACTION**

2      **(Breach of Contract and/or Covenant of Good Faith and Fair Dealing)**

3                    **(All Defendants)**

4        104.    S&S incorporates and realleges the allegations set forth in paragraphs 1 through 103

5    of this Complaint as though fully set forth herein.

6        105.    WFB had a contract with S&S and with Kuntz and/or one or more entities

7    purportedly owned or operated by him. The contract is in the sole possession of Defendants.

8        106.    The wire transfer instructions also constituted a contract with WFB.

9        107.    Upon information and belief, WFB breached the terms of and/or the covenant of good

10    faith and fair dealing implied within the foregoing contracts.

11        108.    S&S was damaged as a result of those breaches and is, therefore, entitled to damages

12    in an amount to be determined at trial in an amount of no less than $1,000,000.

13                    **THIRD CAUSE OF ACTION**

14                  **(Aiding and Abetting Conversion)**

15                    **(All Defendants)**

16        109.    S&S incorporates and realleges the allegations set forth in paragraphs 1 through 108

17    of this Complaint as though fully set forth herein.

18        110.    Kuntz and others defrauded S&S and converted funds from it.

19        111.    The Bank knew that S&S each owned the money that they wire transferred for their

20    own benefit to the Fraudulent Account.

21        112.    The Bank knew that Kuntz and the Hacker, with use of the Fraudulent Account at

22    WFB, wrongfully interfered with S&S's right to their money by wire transferring S&S's money to

23    third party accounts, both domestically and overseas accounts in bank secrecy havens.

24        113.    The Bank substantially assisted Kuntz and the Hacker in its conversion of S&S's

25    money by approving and conducting the wire transfers of the money to third party accounts, both

26    domestically and overseas accounts in bank secrecy havens.

27        114.    As a direct and proximate result of the Bank's aiding and abetting Kuntz and the

28    Hacker's conversion, S&S has suffered compensable damages.

EVANS & KOB, ℙ

**FOURTH CAUSE OF ACTION**

**(Aiding and Abetting Fraud)**

**(All Defendants)**

115.   S&S incorporates and realleges the allegations set forth in paragraphs 1 through 114 of this Complaint as though fully set forth herein.

116.   Kuntz and the Hacker induced S&S to transfer money to them by fraudulently representing that they were S&S's vendor and providing false information about where the payments to the vendor should be sent.

117.   Kuntz and others then took possession of S&S's funds without legal right to do so and have failed and refused to return them to S&S.

118.   Upon information and belief, WFB aided and abetted the foregoing conversion and fraud when it rendered substantial assistance to Kuntz and continued to process wire transfers after it became aware of circumstances that suggested that the bank account was being used for fraudulent purposes.

119.   The Bank knew that rather than use the money to pay the vendor, Kuntz and the Hacker wire transferred the money to third party accounts, both domestically and oversees accounts in bank secrecy havens.

120.   As a direct and proximate result of the Bank's aiding and abetting Kuntz and the Hacker, as a result of WFB's assistance through the Fraudulent Account, S&S suffered compensable damages was damaged as a result of WFB's assistance to Kuntz in an amount to be determined at trial of no less than $1,000,000.

**FIFTH CAUSE OF ACTION**

**(Unjust Enrichment/Constructive Trust)**

**(All Defendants)**

121.   S&S incorporates and realleges the allegations set forth in paragraphs 1 through 120 of this Complaint as though fully set forth herein.

122.   WFB received a benefit in the form of bank fees for processing the wire transfers that it knew or should have known were fraudulent.

22

COMPLAINT

1   123.   It would be unjust to allow WFB to retain such benefit under the circumstances in
2   which it was received.

3   124.   Accordingly, the amount of the benefit WFB received in connection with the
4   fraudulent accounts and wire transfers should be disgorged in an amount to determined at trial.

5   125.   Additionally, a constructive trust should be placed over any funds held in any
6   accounts at WFB by Kuntz or any of the persons who conspired with him.

7                                **SIXTH CAUSE OF ACTION**

8   **Violation of California Business & Professions Code Section 17200 et seq.**

9                                **(All Defendants)**

10   126.   S&S incorporates and realleges the allegations set forth in paragraphs 1 through 125
11   of this Complaint as though fully set forth herein.

12   127.   Section 17200 of the California Business & Profession Code prohibits unfair
13   competition by prohibiting any "unlawful, unfair or fraudulent business acts or practice…"

14   128.   S&S and similarly situated members of the public have been injured as a direct and
15   proximate result of Kuntz and the Hacker's unfair, unlawful and/or fraudulent business practices as
16   alleged above, and the Bank's aiding and abetting thereof, and these proceedings are instituted
17   pursuant to section 17203 and 17204 of the California Business and Professions Code, to obtain
18   relief from Defendants' business acts and practices that violate the Unfair Competition Act.

19   129.   Defendants' conduct, as alleged herein, violates the Unfair Competition Act. The
20   business acts and practices of Defendants constituted and constitutes a common continuous and
21   continuing course of conduct of unfair competition by means of unfair, unlawful and/or fraudulent
22   business acts or practices within the meaning of the Unfair Competition Act including, but in no way
23   limited to, the following:

24       a.   Wire transferring S&S's money to third party accounts, both domestically and
25            overseas accounts in bank secrecy havens;

26       b.   WFB ignoring the fact that its customer made sudden large transactions and had no
27            record of past or present experience thereof – a "red flag" accounting to the "Money
28            Laundering – A Banker's Guide to Avoiding Problems[;]"

                                        23
                                     COMPLAINT

1        c.  WFB ignoring the fact that its customer has wire transfer activity to a financial

2            secrecy haven or high risk geographic location without an apparent business reason –

3            a "red flag" accounting to the "Money Laundering – A Banker's Guide to Avoiding

4            Problems[;]"

5        d.  WFB ignoring the fact that its customer had wire activity that is unexplained,

6            repetitive and shows unusual patterns – a "red flag" accounting to the "Money

7            Laundering – A Banker's Guide to Avoiding Problems[;]"

8        e.  WFB ignoring the fact that its customer had minimal prior activity and then made

9            deposits and immediate requests for wire transfers – Money Laundering Red Flag per

10           the FFIEC;

11        f.  WFB ignoring the fact that its customer maintained its account with high volume

12           activity, which carried a historically low balance – a "red flag" accounting to the

13           "Money Laundering – A Banker's Guide to Avoiding Problems[;]"

14        g.  WFB ignoring the fact that its customer used the account as a temporary repository of

15           funds – Money Laundering Red Flag per the FFIEC; and

16        h.  WFB ignoring the fact that there was a large volume of wire transfers deposited into

17           its customer account when the nature of the account holder's business would not

18           appear to justify such activity – a "red flag" accounting to the "Money Laundering –

19           A Banker's Guide to Avoiding Problems[.]"

20    130.    Defendants' acts, omissions, misrepresentations, practices, and non-disclosures, as

21 alleged herein, constituted and constitute unfair, unlawful and/or fraudulent business practices within

22 the meaning of California Business & Professions Code, section 17200 et. seq.

23    131.    S&S is entitled to relief, including full restitution and/or disgorgement of all

24 revenues, earnings, profits, compensation and benefits which may have been obtained by Defendants

25 as a result of such business acts or practices and enjoining Defendants to cease and design from

26 engaging in the practices described herein.

27    132.    To prevent unjust enrichment pursuant to the California Business & Professions

28 Code, Defendants should be required to place all disgorged illegal gains and profits in a constructive

 EVANS & KOB, PC

1  trust to be established by the court for the purposes of making full restitution to all injured parties.

2  **IV.    JURY TRIAL DEMAND**

3  Plaintiff demand trial by jury with respect to all counts set forth herein and all issues raised

4  hereby.

5  **V.    PRAYER FOR RELIEF**

6  WHEREFORE, S&S prays for judgment against the Defendants, and each of them, as

7  follows:

8  **On the First Cause of Action**

9  **(Negligence)**

10  1.  For compensatory and consequential damages of not less than $1,000,000;

11  2.  For lost income;

12  3.  For attorneys' fees;

13  4.  For costs of suit incurred herein;

14  5.  For interest on any and all damages, fees and costs, at the legal rate from and after the date

15  they were incurred; and

16  6.  For such other and further relief as proper.

17  **On the Second Cause of Action**

18  **(Breach of Contract)**

19  1.  For compensatory and consequential damages of not less than $1,000,000;

20  2.  For lost income;

21  3.  For attorneys' fees;

22  4.  For costs of suit incurred herein;

23  5.  For interest on any and all damages, fees and costs, at the legal rate from and after the date

24  they were incurred; and

25  6.  For such other and further relief as proper.

26  **On the Third Cause of Action**

27  **(Aiding and Abetting Conversion)**

28  1.  For compensatory and consequential damages of not less than $1,000,000;

EVANS & KOB, PC

1    2. For lost income;

2    3. For punitive damages;

3    4. For attorneys' fees;

4    5. For costs of suit incurred herein;

5    6. For interest on any and all damages, fees and costs, at the legal rate from and after the date

6        they were incurred; and

7    7. For such other and further relief as proper.

8                  **On the Fourth Cause of Action**

9                  **(Aiding and Abetting Conversion)**

10    1. For compensatory and consequential damages of not less than $1,000,000;

11    2. For lost income;

12    3. For punitive damages;

13    4. For attorneys' fees;

14    5. For costs of suit incurred herein;

15    6. For interest on any and all damages, fees and costs, at the legal rate from and after the date

16        they were incurred; and

17    7. For such other and further relief as proper.

18                  **On the Fifth Cause of Action**

19             **(Unjust Enrichment/Constructive Trust)**

20    1. For an order of this Court avoiding the described payments, fees and transfers;

21    2. For an attachment in favor of Plaintiff on all assets transferred under the payments, fees and

22        transfers described, and on all proceeds of those assets;

23    3. For damages in an amount to be determined at trial;

24    4. For lost income;

25    5. For attorney's fees;

26    6. For costs of suit incurred; and

27    7. For such other and further relief as proper.

28

1 | **On the Sixth Cause of Action**

2 | **(Violation of California Business & Professions Code Section 17200 et seq.)**

3 | 1.  For an order of this Court avoiding the described payments, fees and transfers;

4 | 2.  For an attachment in favor of Plaintiff on all assets transferred under the payments, fees and

5 | transfers described, and on all proceeds of those assets;

6 | 3.  For damages in an amount to be determined at trial;

7 | 4.  For lost income;

8 | 5.  For attorney's fees;

9 | 6.  For costs of suit incurred; and

10 | 7.  For such other and further relief as proper.

11 |

12 | Dated: October 28, 2019          Respectfully submitted,

13 |                                  **EVANS & KOB, PC**

14 |

15 | By: _____

16 | Brett G. Evans
Attorneys for Plaintiff S&S Worldwide, Inc.

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

26 |

27 |

28 |

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):*<br>— Brett G. Evans (Bar No. 244213)<br>Evans & Kob, PC<br>155 N. Riverview St., Suite 304<br>Anaheim, California 92808<br>TELEPHONE NO.: (657) 210-2114   FAX NO.: (888) 956-7890<br>ATTORNEY FOR *(Name):* Plaintiff S&S Worldwide, Inc. | FOR COURT USE ONLY<br><br>**NO SUMMONS ISSUED**<br>**FILED**<br>*San Francisco County Superior Court*<br><br>OCT 2 9 2019<br><br>CLERK OF THE COURT<br>BY: _Kalene Johnio_<br>Deputy Clerk |
|---|---|

SUPERIOR COURT OF CALIFORNIA, COUNTY OF   San Francisco
STREET ADDRESS: 400 McAllister St.
MAILING ADDRESS:
CITY AND ZIP CODE: San Francisco, CA 94102
BRANCH NAME: Civic Center Courthouse

CASE NAME:
S&S Worldwide, Inc. v Wells Fargo Bank, NA et al.

| **CIVIL CASE COVER SHEET** | | **Complex Case Designation** | CASE NUMBER:<br>**CGC-19-580355** |
|---|---|---|---|
| ✓ Unlimited<br>(Amount<br>demanded<br>exceeds $25,000) | ☐ Limited<br>(Amount<br>demanded is<br>$25,000 or less) | ☐ Counter   ☐ Joinder<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | JUDGE:<br>DEPT: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
☐ Auto (22)
☐ Uninsured motorist (46)
**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
☐ Asbestos (04)
☐ Product liability (24)
☐ Medical malpractice (45)
☐ Other PI/PD/WD (23)
**Non-PI/PD/WD (Other) Tort**
✓ Business tort/unfair business practice (07)
☐ Civil rights (08)
☐ Defamation (13)
☐ Fraud (16)
☐ Intellectual property (19)
☐ Professional negligence (25)
☐ Other non-PI/PD/WD tort (35)
**Employment**
☐ Wrongful termination (36)
☐ Other employment (15)

**Contract**
☐ Breach of contract/warranty (06)
☐ Rule 3.740 collections (09)
☐ Other collections (09)
☐ Insurance coverage (18)
☐ Other contract (37)
**Real Property**
☐ Eminent domain/Inverse condemnation (14)
☐ Wrongful eviction (33)
☐ Other real property (26)
**Unlawful Detainer**
☐ Commercial (31)
☐ Residential (32)
☐ Drugs (38)
**Judicial Review**
☐ Asset forfeiture (05)
☐ Petition re: arbitration award (11)
☐ Writ of mandate (02)
☐ Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
☐ Antitrust/Trade regulation (03)
☐ Construction defect (10)
☐ Mass tort (40)
☐ Securities litigation (28)
☐ Environmental/Toxic tort (30)
☐ Insurance coverage claims arising from the above listed provisionally complex case types (41)
**Enforcement of Judgment**
☐ Enforcement of judgment (20)
**Miscellaneous Civil Complaint**
☐ RICO (27)
☐ Other complaint *(not specified above)* (42)
**Miscellaneous Civil Petition**
☐ Partnership and corporate governance (21)
☐ Other petition *(not specified above)* (43)

2. This case ☐ is  ✓ is not   complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. ☐ Large number of separately represented parties   d. ☐ Large number of witnesses
   b. ☐ Extensive motion practice raising difficult or novel   e. ☐ Coordination with related actions pending in one or more courts
      issues that will be time-consuming to resolve      in other counties, states, or countries, or in a federal court
   c. ☐ Substantial amount of documentary evidence   f. ☐ Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply):* a. ✓ monetary  b. ✓ nonmonetary; declaratory or injunctive relief   c. ☐ punitive
4. Number of causes of action *(specify):* 6
5. This case ☐ is  ✓ is not   a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: October 28, 2019
Brett G. Evans
_____
(TYPE OR PRINT NAME)

_Brett B. Evans_
_____
(SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on **all** other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>CM-010 [Rev. July 1, 2007] | **CIVIL CASE COVER SHEET** | Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;<br>Cal. Standards of Judicial Administration, std. 3.10<br>*www.courtinfo.ca.gov* |
|---|---|---|

CM-010

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
 Auto (22)–Personal Injury/Property
  Damage/Wrongful Death
 Uninsured Motorist (46) (*if the
  case involves an uninsured
  motorist claim subject to
  arbitration, check this item
  instead of Auto*)
**Other PI/PD/WD (Personal Injury/
Property Damage/Wrongful Death)
Tort**
 Asbestos (04)
  Asbestos Property Damage
  Asbestos Personal Injury/
   Wrongful Death
 Product Liability (*not asbestos or
  toxic/environmental*) (24)
 Medical Malpractice (45)
  Medical Malpractice–
   Physicians & Surgeons
  Other Professional Health Care
   Malpractice
 Other PI/PD/WD (23)
  Premises Liability (e.g., slip
   and fall)
  Intentional Bodily Injury/PD/WD
   (e.g., assault, vandalism)
  Intentional Infliction of
   Emotional Distress
  Negligent Infliction of
   Emotional Distress
  Other PI/PD/WD
**Non-PI/PD/WD (Other) Tort**
 Business Tort/Unfair Business
  Practice (07)
 Civil Rights (e.g., discrimination,
  false arrest) (*not civil
  harassment*) (08)
 Defamation (e.g., slander, libel)
  (13)
 Fraud (16)
 Intellectual Property (19)
 Professional Negligence (25)
  Legal Malpractice
  Other Professional Malpractice
   (*not medical or legal*)
 Other Non-PI/PD/WD Tort (35)
**Employment**
 Wrongful Termination (36) Other
  Employment (15)

**Contract**
 Breach of Contract/Warranty (06)
  Breach of Rental/Lease
   Contract (*not unlawful detainer
    or wrongful eviction*)
  Contract/Warranty Breach–Seller
   Plaintiff (*not fraud or negligence*)
  Negligent Breach of Contract/
   Warranty
  Other Breach of Contract/Warranty
 Collections (e.g., money owed, open
  book accounts) (09)
  Collection Case–Seller Plaintiff
  Other Promissory Note/Collections
   Case
 Insurance Coverage (*not provisionally
  complex*) (18)
  Auto Subrogation
  Other Coverage
 Other Contract (37)
  Contractual Fraud
  Other Contract Dispute
**Real Property**
 Eminent Domain/Inverse
  Condemnation (14)
 Wrongful Eviction (33)
 Other Real Property (e.g., quiet title) (26)
  Writ of Possession of Real Property
  Mortgage Foreclosure
  Quiet Title
  Other Real Property (*not eminent
   domain, landlord/tenant, or
   foreclosure*)
**Unlawful Detainer**
 Commercial (31)
 Residential (32)
 Drugs (38) (*if the case involves illegal
  drugs, check this item; otherwise,
  report as Commercial or Residential*)
**Judicial Review**
 Asset Forfeiture (05)
 Petition Re: Arbitration Award (11)
 Writ of Mandate (02)
  Writ–Administrative Mandamus
  Writ–Mandamus on Limited Court
   Case Matter
  Writ–Other Limited Court Case
   Review
 Other Judicial Review (39)
  Review of Health Officer Order
  Notice of Appeal–Labor
   Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal.
Rules of Court Rules 3.400–3.403)**
 Antitrust/Trade Regulation (03)
 Construction Defect (10)
 Claims Involving Mass Tort (40)
 Securities Litigation (28)
 Environmental/Toxic Tort (30)
 Insurance Coverage Claims
  (*arising from provisionally complex
  case type listed above*) (41)
**Enforcement of Judgment**
 Enforcement of Judgment (20)
  Abstract of Judgment (Out of
   County)
  Confession of Judgment (*non-
   domestic relations*)
  Sister State Judgment
  Administrative Agency Award
   (*not unpaid taxes*)
  Petition/Certification of Entry of
   Judgment on Unpaid Taxes
  Other Enforcement of Judgment
   Case
**Miscellaneous Civil Complaint**
 RICO (27)
 Other Complaint (*not specified
  above*) (42)
  Declaratory Relief Only
  Injunctive Relief Only (*non-
   harassment*)
  Mechanics Lien
  Other Commercial Complaint
   Case (*non-tort/non-complex*)
  Other Civil Complaint
   (*non-tort/non-complex*)
**Miscellaneous Civil Petition**
 Partnership and Corporate
  Governance (21)
 Other Petition (*not specified
  above*) (43)
  Civil Harassment
  Workplace Violence
  Elder/Dependent Adult
   Abuse
  Election Contest
  Petition for Name Change
  Petition for Relief From Late
   Claim
  Other Civil Petition

American LegalNet, Inc.
www.FormsWorkflow.com